IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JAMES SHAUD,

              Plaintiff,

    v.

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL
SECURITY,

              Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 15-2278 (JBS)

**OPINION**

APPEARANCES:

F. Michael Friedman, Esq.
340 N. Landsdowne Ave.
P.O. Box 467
Drexel Hill, PA 19026
    -and-
Karl E. Osterhout, Esq.
OSTERHOUT DISABILITY LAW, LLC
521 Cedar Way, Suite 200
Oakmont, PA 15139
    Attorney for Plaintiff

Paul J. Fishman
UNITED STATES ATTORNEY
    By: Theresa A. Casey
        Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
300 Spring Garden Street
Philadelphia, PA 19123
    Attorney for Defendant

**SIMANDLE, Chief Judge:**

**I. INTRODUCTION**

    In this action, Plaintiff James Shaud (hereinafter,

"Plaintiff"), a twenty-six-year-old (on the alleged onset of

disability date) with past work experience as a manual laborer
(among other jobs), seeks review of the Commissioner of the
Social Security Administration's (hereinafter, "Defendant" or
"the Commissioner") denial of his application for Social
Security Benefits pursuant to 42 U.S.C. § 405(g).

Plaintiff, an individual with a history of chronic back
issues dating back to a spinal fusion procedure in 1995, claims
disability from spinal fusion, migraines, and arthritis.  In an
eleven-page decision dated November 14, 2014, the Administrative
Law Judge (hereinafter, the "ALJ") concluded that Plaintiff's
back-related impairments, although severe, enabled him to
perform the full range of sedentary work.  (See R. at 9-19.)  As
a result, the ALJ found Plaintiff not disabled within the
meaning of the Social Security regulations, because his residual
functional capacity (hereinafter, the "RFC") allowed him to
perform jobs that exist in significant numbers within the
national economy.  (See generally id. at 18-19.)

In the pending appeal, Plaintiff argues that the ALJ erred
in two respects.  First, Plaintiff takes the view that the ALJ
improperly evaluated the disability opinion of Plaintiff's long-
time family physician, John Pirolli, D.O., because it supports,
at least in Plaintiff's mind, only the conclusion that Plaintiff
suffers from a qualifying disability.  (See Pl.'s Br. at 5-14;
Pl.'s Reply at 2.)  Second, Plaintiff claims that, in finding

2

Plaintiff capable of return to work, the ALJ improperly relied upon the Medical-Vocational framework, or grids, despite the record evidence reflecting Plaintiff's nonexertional limitations. (See Pl.'s Br. at 14-18; Pl.'s Reply at 3-5.)

The Commissioner, by contrast, takes the position that substantial evidence supports the ALJ's decision denying disability benefits, because he appropriately reviewed the record evidence through the lens of the applicable statutory and legal framework. (See generally Def.'s Opp'n at 1, 9-14.) More specifically, Defendant argues that the ALJ rightly discounted Dr. Pirolli's "check-the-box" opinion concerning Plaintiff's inability to perform work, because it conflicted with the remaining medical evidence, and similarly asserts that the ALJ committed error in relying upon the grid, given the paucity of evidence supporting any non-exertional limitations. (Id.)

The record evidence amply reflects Plaintiff's consistent complaints of lower back pain, and indicates this pain impaired (to some extent) his functional, physical abilities. Nevertheless, the principal issue before the Court concerns whether substantial evidence supports the ALJ's conclusion that Plaintiff retained the residual functional capacity to perform the full range of sedentary work, despite the limitations associated with his largely undisputed physical condition.

3

For the reasons explained below, the Court will affirm the ALJ's decision denying Plaintiff's application for Social Security benefits.

## II.  BACKGROUND

### A.  Plaintiff's Medical Background, Generally

Plaintiff's back-related issues date back to his early childhood, during which he received ongoing treatment from an orthopaedic clinic for progressive scoliosis, spondyloepiphyseal dysplasia, and a seizure disorder.  (See generally R. at 294-320.)  Indeed, on September 26, 1995, Plaintiff (at age twelve) underwent "spinal fusion from T2-L2" and the installation of Harrington rods in order to correct his spinal curvature.[1]  (R. at 294-95.)  Shortly after the operation, the orthopaedic surgeons discharged Plaintiff on October 3, 1995, with instructions "to remain on light activities" and continue physical therapy.  (R. at 295.)

Following this early operation and physical therapy, however, Plaintiff's condition appears to have markedly improved.  Indeed, from early 1999 through much of 2009, Plaintiff completed, without issue, years of "heavy labor" as a dietary aide, a warehouse worker, a produce

---

[1] Although this history predates the period relevant to the Social Security application at issue here, Plaintiff's historical treatment records provide the contextual backdrop for his current condition, and so the Court recounts them here.

packer/shipper/receiver, and an automobile mechanic.[2]  (See, e.g., R. at 191-95, 217, 238, & 251.)  These jobs required him to remain physically active, and on his feet, lifting, carrying, and/or pushing heavy items for large portions of every work day, and he appears to have experienced no physical impediment to performing these tasks.[3]  (See, e.g., R. at 218-221.)

Beginning in August 2008, however, Plaintiff began seeking emergency medical treatment for back, neck, and shoulder pain. (See, e.g., R. at 321-38, 415-34.)  In connection with each visit, the emergency room physician noted Plaintiff's chronic back issues, and his complaints of severe back pain, but released him on each occasion (and without any overnight admissions) with instructions to take over-the-counter pain medication as needed.[4]  (See, e.g., R. at 322-24, 333-35.)

---

[2] Plaintiff claimed to have little recollection of the exact dates of his prior employment, and provided instead only approximate dates for each period of employment.  (See, e.g., R. at 258 ("On my work history I am not sure of [the] Dates worked.").)  Plaintiff's certified earnings statement, however, provides greater detail on the precise dates of Plaintiff's prior employment.  (See R. at 188-95.)

[3] During this period, Plaintiff received treatment from Dr. Paul Peterson, III, D.O. and Dr. Pirolli, for a range of non-back-related issues (like, for example, sinus congestion, colds, and similar routine ailments).  (See, e.g., R. at 339-47.)

[4] On account of these issues, Plaintiff filed his first application for Social Security benefits on October 15, 2008, listing June 1, 2006 as his alleged onset of disability date. (See R. at 60-61, 63.)  Defendant, however, denied this initial application on March 10, 2009, at the initial level of review, and Plaintiff filed no appeal of that determination.  (See R. at 63, 104-09, 206-08, & 217-32.)

Following these emergency room visits, on December 12, 2008, Plaintiff's general family physician, Dr. Pirolli, referred him to University Imaging Center for an MRI of his spine, on account of Plaintiff's complaints of radiating "back pain" and associated numbness in his extremities.  (R. at 343.) The results of the MRI, however, revealed only slight spinal "levoscoliosis," but "[n]o significant lumbar disc herniation, canal or foraminal stenosis."  (Id.)  Stated differently, although the MRI depicted an individual with a significant history of spinal issues (complete with Harrington rods along portions of his spine), the testing did not reveal any advanced spinal curvature beyond that addressed by the spinal fusion operation.  (See id.)

In the aftermath of this treatment, on January 30, 2009, David H. Clements, M.D., made similar findings following his evaluation of Plaintiff at the Bone and Joint Institute of Cooper University Hospital.  (See R. at 348-49.)  More specifically, Dr. Clements observed that Plaintiff had "a well-healed scar on his back," no signs of redness, swelling, or drainage, a "normal range of motion of his lower back for age," and only mild to moderate tenderness.  (Id.)  As a result, Dr. Clements diagnosed Plaintiff with "lower back pain," and recommended a regime of physical therapy, but otherwise imposed no restrictions of Plaintiff's physical activities.  (Id.)

6

On October 11, 2009, November 27, 2009, and February 17, 2010, however, Plaintiff sought additional emergency medical treatment, after certain physical exertion left him with tenderness in his lower back.[5]  (See R. at 383-90, 397-414.)  In connection with each evaluation, emergency room physicians observed various degrees of tenderness, directed Plaintiff to follow-up with his primary care physician, Dr. Pirolli, and prescribed medication (both prescription and over-the-counter) in order to relieve his pain.  (R. at 388, 400-01, & 409-10.)

Following these late 2009 emergency room visits, Plaintiff did not seek medical treatment, emergency or otherwise, relative to back pain for over one year.[6]  (See R. at 15.)  On February 27, 2011, however, Plaintiff presented himself to an emergency medical facility, with renewed complaints of an "acute headache" and "lower back pain."  (R. at 372-77.)  Despite his claims, an evaluation revealed normal neurological results, and his physical symptoms "markedly improved after treatment."  (R. at 373.)  As a result, the emergency room physician discharged

---

[5] On February 17, 2010, for example, Plaintiff complained of severe back pain following a "week" of shoveling snow.  (R. at 388.)

[6] Throughout this period, Plaintiff did, however, seek emergency medical treatment for other issues, including, dental pain/a toothache.  (See R. at 391-96.)  Although the emergency room physician identified his history of back issues on these occasions, Plaintiff presented no back-related complaints. (See, e.g., R. at 391.)

Plaintiff with instructions to take Advil as needed, and to follow up with his primary care physician, Dr. Pirolli (again, if and as necessary). (See R. at 373.)

The contemporaneous treatment notes of Dr. Pirolli, in turn, indicate that Dr. Pirolli contiually filled prescriptions for hydrocodone, and include serial notations to the fact that Plaintiff's pain remained "ok" or even improved while on medication.[7] (R. at 435-46.) Indeed, on June 27, 2012, Dr. Pirolli noted that Plaintiff' pain decreased significantly while on medication (to a 2 on a 10-point pain scale). (See R. at 436.) On November 14, 2012, however, Plaintiff returned to the hospital after he fell down the stairs, and sustained injuries to his lower back, left-sided ribs, and left hib. (See R. at 450-57.) Despite this fall, the emergency room physician found his symptoms "mild ... at their worst," and an evaluation of Plaintiff revealed normal neurological functioning, a full range of motion, normal spinal alignment, and only slight pain in the lower and mid-back areas. (R. at 455-56.) Even more importantly, though, his mild symptoms "markedly improved after treatment," and so the emergency room physician discharged him

---

[7] In fact, the treatment notes create the impression that Plaintiff met with Dr. Pirolli solely for the purposes of renewing or refilling his prescriptions for pain medications, because nearly each treatment notes states, at the top, that Plaintiff sought treatment "for [a] refill on medication." (R. at 436.)

with a prescription for Vicodin, and an instruction to continue follow-up care with Dr. Pirolli. (R. at 454, 457.) In the aftermath of this emergency room visit, a November 2012 x-ray study and a December 2012 MRI of Plaintiff's lumbar spine similarly revealed no acute or abnormal findings (See R. at 449, 452).

**B.   Plaintiff's Social Security Benefits Application**

Against this backdrop, on December 10, 2012, Plaintiff filed the Social Security benefits application at issue here, claiming an inability to work as of December 31, 2009. (See R. at 62, 110-11.) In connection with the SSA's review of Plaintiff's initial application, the New Jersey Division of Disability Services conducted a face-to-face interview of Plaintiff on January 7, 2013. (See R. at 233-35.) During the interview, the examiner noted that Plaintiff "stood a couple [of] time[s] ... and made gestures as though in pain," but observed no difficulty in Plaintiff's ability to stand, walk, or otherwise participate in the interview. (R. at 235.)

Following this initial interview, the claims adjudicator requested that Plaintiff complete a functional audit and work history report, describing, in greater written detail, the manner in which his claimed impairments limit his daily activities. (See R. at 243-59.) In connection with his functional audit, Plaintiff explained that his "physical

condition" prevents him from bending, standing, reaching, kneeling, or otherwise participating in any activity other than watching television.  (R. at 243-50.)  Indeed, Plaintiff claimed that his daily life, at least as of January 22, 2013, entailed little more than waking up, eating breakfast, brushing his teeth, and watching television, because his constant state of pain and stiffness left him barely able to "lift a gallon of milk."  (See, e.g., R. at 243-50.)

Despite these claims, in his work history report, Plaintiff revealed a wide-ranging history of prior employment, consisting almost exclusively of manual labor positions.  (See R. at 251-59.)  Indeed, during the times of his employment, all of which occurred years after his spinal fusion surgery, Plaintiff professed, among other things, an ability to "lift heavy boxes of produce," to push "shopping carts," to carry heavy car parts and tools, and to lift merchandise onto shelves.  (R. at 252-57.)

After completing these assessments, Plaintiff sat for an orthopaedic examination with Ronald Bagner, M.D., on April 1, 2013.  (See R. at 463-67.)  As in his self-completed assessments, Plaintiff reported great pain in his lower back (pain he claimed only intensified in "about 2008 or 2009"), and explained that he suffers from "10-15 migraine headaches a month."  (R. at 463.)  Dr. Bagner, however, observed that

Plaintiff walked with only a mildly "antalgic" gait (but without a cane or crutches), climbed and descended the examination table without difficulty, dressed and undressed without assistance, and could heel and toe walk. (See R. at 463-64.) Beyond this, Plaintiff could "make a fist and ... oppose the thumbs," and an examination of his cervical spine and upper and lower extremities revealed otherwise normal results. (Id.)

Based in large part upon Dr. Bagner's assessment (along with the remaining medical evidence), the SSA's non-examining state agency physician, Zwi Kahanowicz, M.D., reviewed the record on April 19, 2013, and found that Plaintiff's exertional limitations left him able (1) to occasionally lift twenty pounds and frequently lift ten pounds, (2) to stand and/or walk for six hours in an eight-hour day, (3) to sit for six hours in an eight-hour work day, (4) to occasionally stoop and climb ladders, ropes, and scaffolds, and (5) to frequently balance, kneel, crouch, crawl, and climb stairs. (See R. at 66-69.) In other words, Dr. Kahanowicz found Plaintiff able to perform the full range of "LIGHT" sedentary work. (R. at 65, 69.) On account of this RFC, the SSA denied his initial application for Social Security benefits on April 24, 2013. (See R. at 69-70, 80-81, 112-23.)

Plaintiff requested reconsideration of this initial denial on May 15, 2013. (See R. at 124-28.) In seeking

11

reconsideration, Plaintiff reiterated that his chronic pain and stiffness precluded him from performing the activities that he once could. (See R. at 83, 142.) Indeed, Plaintiff claimed, for the first time, that this inability had caused him to become depressed and unmotivated.[8] (See R. at 83.) In addition, on May 21, 2013, Dr. Pirolli provided his opinion concerning Plaintiff's ability to perform work-related activities. (See R. at 468-69.) In his opinion, Dr. Pirolli stated that Plaintiff could rarely climb bend, crouch, lift heavy weights (above 25 pounds), or reach in all directions (including overhead), and would frequently have to alternate between sitting and standing in order to relieve pain. (See id.) Despite these limitations, Dr. Pirolli reasoned that Plaintiff could sit for up to six hours, stand for three hours, frequently carry up to ten pounds, and could occasionally climb stairs, balance, or kneel. (See id.) Armed with this additional evidence, non-examining state agency physician, Isabella Rampello, M.D., reviewed the record anew on June 20, 2013, and concluded that Plaintiff retained the functional capacity to perform "LIGHT" sedentary work. (See R. at 82-101.) As a result, on June 26, 2013, the SSA denied

---

[8] Despite his claim, the non-examining state agency psychologist, Joseph Wieliczko, Psy. D., discounted Plaintiff's psychological claim, because Plaintiff had not received "any medication" or psychiatric treatment, and because the record evidence contained, overall, no indication "of any psychiatric condition." (R. at 87.)

Plaintiff's application at the reconsideration level. (See R. at 102-03, 129-34.)

Following these denials, on August 21, 2013, Plaintiff requested, with counsel, a de novo hearing before an ALJ, and expressed an intention to provide additional medical evidence.[9] (See R. at 137-41.)  More specifically, on May 30, 2014, Plaintiff submitted the follow-up opinions of Dr. Pirolli concerning Plaintiff's physical capabilities to perform work. (See R. at 505-06, 511-12.)  In these opinions, Dr. Pirolli reiterated his earlier impression of the limitations of the "rigid spine" associated with Plaintiff's spinal fusion procedure (nearly twenty years earlier).  Dr. Pirolli restated, in particular, his view that Plaintiff could carry weight of no more ten pounds, could sit, stand, and/or walk for nor more than two hours, and could not walk, climb, stoop, bend, or lift for any sustained period. (See R. at 505-06, 511.)  As a result of these limitations, Dr. Pirolli expressed his opinion that Plaintiff could not maintain full-time employment. (See R. at 511-12.)

---

[9] In the meantime, Plaintiff returned to the emergency department in April 2014 after he fell from his bicycle. (See R. at 493).  Despite the fall, a CT scan of his cervical spine revealed limited degenerative changes, no "acute fracture deformity," and the reviewing physician only directed Plaintiff to receive "[f]ollow-up [care] as warranted."  (R. at 497.)

**C.   ALJ's Decision and Affirmance by the Appeals Council**

Following submission of this additional evidence, the ALJ, Mark G. Barrett, convened a hearing on July 9, 2014, at which time Plaintiff appeared, with counsel, and the ALJ received brief testimony from Plaintiff concerning his functional abilities.  (See generally R. at 24-59.)  As relevant here, Plaintiff explained to the ALJ that he lives on the second-floor of a two-story home with his mother and (then) 12-year-old nephew, and that his 14-year-old daughter lives in North Carolina with her mother.  (See R. at 31-32.)  In addition, Plaintiff testified that he last worked in 2011 for the dietary department of a retirement community, and no longer has a license on account of a DUI he received in 2009.  (See R. at 33-43, 52.)  Plaintiff then explained the effects of the "persistent" pain from his scoliosis and migraine headaches. (R. at 37-47.)  Despite this pain, however, Plaintiff claimed an ability to climb stairs (indeed, his second-floor bedroom required him to do so daily), to lift and carry weight of up to ten pounds, and to perform routine and simple household chores (like, for example, washing dishes).  (See R. at 47-58.)

Following the hearing, and a "30-day window of opportunity" to submit additional evidence,[10] the ALJ issued a written decision on November 14, 2014, in which he applied the five-step sequential analysis to Plaintiff's application for Social Security benefits.  (See generally R. at 9-19.)  The ALJ concluded, at step one, that Plaintiff had not engaged in substantial gainful activity since December 31, 2009, the alleged onset date.  (See R. at 11.)  At steps two and three, the ALJ found that Plaintiff suffered from lumbar degenerative disc disease, a history of lumbar fusion, and "Harrington rods secondary to scoliosis" (R. at 12), but found that these impairments (or combination of impairments) did not meet or equal in severity the impairment listing for "disorders of the spine," Listing section 1.04.  (See R. at 12-13.)  In reaching this conclusion, the ALJ noted that Plaintiff's medical evidence did not demonstrate "sensory or reflex loss," "spinal arachnoiditis," nor the need for "an assistive device to ambulate."  (R. at 13.)

Turning then to Plaintiff's residual functional capacity, the ALJ discussed, at length, Plaintiff's testimony and other statements concerning his physical limitations, the medical

---

[10] Despite the additional time, Plaintiff does not appear to have capitalized upon the opportunity to submit further medical evidence.

15

opinions rendered by the various consultative and non-consultative examiners, as well as the treatment records of Plaintiff's treating physician, Dr. Pirolli, and various emergency room physicians. (See generally R. at 13-18.) Despite Plaintiff's subjective representations, however, the ALJ found Plaintiff's statements concerning the "intensity, persistence, and limiting effects" of his condition incongruent with the objective medical record. (R. at 14.) The ALJ noted, in particular, that although the medical record revealed lower back pain, the years of examination notes documented no significant functional limitations and an otherwise normal range of motion. (See R. at 15-17.) Even more critically, the ALJ recounted the wide gaps in Plaintiff's treatment history (he, for example, sought no treatment from February 2010 to February 17, 2011), and the inconsistency between Dr. Pirolli's "check-the-box" no-work opinion and the remaining medical record (including, most especially, Dr. Pirolli's own treatment records). (R. at 15-18.)

After surveying all of this evidence, the ALJ determined that Plaintiff possessed the residual functional capacity to perform the full range of sedentary work. (See R. at 13-18.) With this RFC, the ALJ looked to the Medical-Vocational Guidelines and SSR 85-15, and determined that Plaintiff could, despite his limitations, perform work existing in significant

16

numbers within the national economy.  (R. at 19.)  As a result,
the ALJ found Plaintiff "not disabled" as defined in the Social
Security Act.  (R. at 19.)

Following the decision, Plaintiff filed a formal request
for review on January 6, 2015, claiming that the ALJ's decision
rested upon "legal error," and armed with additional briefing.
(R. at 5, 291-93.)  On February 9, 2015, however, the Appeals
Council found "no reason" to review the ALJ's decision, thereby
rendering the ALJ's decision the final administration decision
in this action.  (R. at 1-3.)  Plaintiff timely filed this
action, which Defendant opposes.  The Court has jurisdiction to
review the Defendant's final decision pursuant to 42 U.S.C. §
405(g).

## III. STANDARD OF REVIEW

### A.   Scope of Review, Generally

When reviewing the denial of disability benefits, the Court
must determine whether substantial evidence supports the denial.
Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v.
Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008).  The
requirement of substantial evidence, however, constitutes a
deferential standard of review, see Jones v. Barnhart, 364 F.3d
501, 503 (3d Cir. 2004), and does not require "a large or [even]
considerable amount of evidence." Pierce v. Underwood, 487 U.S.
552, 564 (1988).  Rather, substantial evidence requires "more

than a mere scintilla[,]" Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), but generally less than a preponderance.  See Jones, 364 F.3d at 503; see also Rubinson v. Comm'r of Soc. Sec., 96 F. Supp. 3d 386, 394-95 (D.N.J. 2015) (setting forth the same general framework).

In order to facilitate the Court's review, the ALJ must set out a specific factual basis for each finding.  Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975).  Additionally, the ALJ "must adequately explain in the record [the] reasons for rejecting or discrediting competent evidence," Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)), and must review all pertinent medical and nonmedical evidence "and explain his conciliations and rejections."  Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).  However, the ALJ need not discuss "every tidbit of evidence included in the record."  Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004).  Rather, the ALJ must set forth sufficient findings to satisfy the reviewing court that the ALJ arrived at a decision through application of the proper legal standards, and upon a complete review of the relevant factual record.  See Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983).

## B.   Statutory and Regulatory Standards for Determination of Disability

The SSA reviews claims of disability in accordance with the sequential five-step process set forth in 20 C.F.R. § 404.1520. In step one, the SSA determines whether the claimant currently engages in "substantial gainful activity."  20 C.F.R. § 1520(b). In step two, the claimant must demonstrate that the claimant suffers from a "severe impairment."  20 C.F.R. § 1520(c). Impairments lacking sufficient severity render the claimant ineligible for disability benefits.  See Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  Step three requires the Commissioner to compare medical evidence of the claimant's impairment to the list of impairments presumptively severe enough to preclude any gainful activity.  20 C.F.R. § 1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Plummer, 186 F.3d at 428. Step four requires the ALJ to consider whether the claimant retains the ability to perform past relevant work.  20 C.F.R. § 1520(e).  If the claimant's impairments render the claimant unable to return to the claimant's prior occupation, the ALJ will consider in step five whether claimant possesses the capability to perform other work existing in significant numbers in the national economy, given

the claimant's RFC, age, education, and work experience.   20
C.F.R. § 1520(g); 20 C.F.R. 404.1560(c).

## IV.   DISCUSSION

Here, Plaintiff presents two challenges to the ALJ's
finding, and the Court will address each in turn.

### A.   Whether Substantial Evidence Supports the ALJ's RFC Assessment

In addressing Plaintiff's residual functional capacity, the
ALJ concluded, as explained above, that Plaintiff retained the
ability to perform the full range of sedentary work.  (See R. at
13-18.)

Plaintiff argues that the ALJ's residual functional
capacity assessment lacks substantial evidentiary support,
because he erroneously evaluated and rejected the two "check-
the-box" work opinions of Plaintiff's family physician, Dr.
Pirolli.  (See Pl.'s Br. at 7-14.)  More specifically, Plaintiff
points to Dr. Pirolli's "un-contradicted" depiction of
Plaintiff, in two serial work opinions submitted for purposes of
his benefits' application, as an individual unable "to tolerate
eight hour workdays."  (Id. at 8-12)  Based upon these opinions,
Plaintiff takes the view that the ALJ had no choice but to find
him disabled.  (See generally id.)  Defendant, by contrast,
advances the position that the ALJ appropriately discounted slim
portions of Dr. Pirolli's opinion given its inconsistency with

20

other record evidence, and submits in any event that substantial evidence supports the ALJ's overall assessment of Plaintiff's residual function capacity.  (See Def.'s Opp'n at 8-12.)  For the reasons that follow, the Court finds that substantial evidence supports the ALJ's assessment of Plaintiff's RFC.

An individual's residual functional capacity, or RFC, constitutes the most the person can do in a work setting despite the limitations imposed by the individual's impairments.  See 20 C.F.R. § 404.1545(a)(1).  In reviewing the record to make an RFC assessment, the ALJ must take into account all the medical opinion evidence along with all other relevant evidence in the record, 20 C.F.R. § 404.1527(b), and must allocate weight to each medical opinion upon which the ALJ relies.  See Weidman v. Colvin, No. 14-552, 2015 WL 5829788, at *9 (M.D. Pa. Sept. 30, 2015).

In the face of conflicting evidence, however, the ALJ retains significant discretion in deciding whom to credit. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); Brown v. Astrue, 649 F.3d 193, 196 (3d Cir. 2011) (noting that "the ALJ is entitled to weigh all evidence in making its finding" and the ALJ is not required to accept the opinion of any medical expert).  In applying that discretion, the opinions of treating sources, of course, merit significant consideration, see Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir.

21

2011) (citing 20 C.F.R. §§ 404.1527(f) and 416.927(f)), and the ALJ cannot simply "reject evidence for no reason or for the wrong reason." Plummer, 186 F.3d at 429 (citation omitted); see also Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008) ("Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence.") (quoting Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000)).  Nevertheless, the "ALJ — not treating or examining physicians or State agency consultants — must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361 (citations omitted); see also Cruz v. Colvin, No. 15-1639, 2016 WL 1091347, at *8 (D.N.J. Mar. 21, 2016) (applying the same framework).

Applying these principles here, the Court finds that the ALJ's RFC determination rests upon substantial evidence, and that the ALJ committed no reversible error in his reliance upon, or partial rejection of, Dr. Pirolli's finding of disability. Indeed, in reaching his RFC decision, the ALJ (1) surveyed the broad landscape of record evidence, including the opinions of treating, examining, and non-examining consultants, (2) discussed chronologically, and at great length, the various observations of Plaintiff's condition, as described throughout the record evidence, and (3) provided a detailed explanation

concerning the evidence he credited and discredited (including, most especially, Dr. Pirolli).  (See R. at 13-18.)

Based upon this exhaustive review and discussion, the ALJ noted Plaintiff's persistent complaints of lower back pain, but found that proper medication markedly abated – and partially resolved – the severity of Plaintiff's symptoms, and that the objective medical evidence consistently undermined Plaintiff's claim of significant functional limitations.  (See R. at 14-16.) In support of this conclusion, the ALJ pointed to the sequential evaluations that described Plaintiff as **(1)** having "no significant disc herniation" (in 2008), **(2)** "no weakness or numbness ... 5/5 strength ... normal deep tendon reflexes ... [and] full sensation" (in 2009 and 2010), **(3)** "5/5 strength in all extremities, steady gait, normal deep tendon reflexes, and normal sensation" (in 2011), **(4)** a pain level of "only 2 out of 10 with his medications ... and a normal range of motion in his back and extremities" (in 2012), and **(5)** "good heel and toe walking ... normal lumbar flexion ... no motor or sensory abnormalities in the lower extremities ... no atrophy of the lower extremity musculature, and ... 2+ reflexes bilaterally" (in 2013).  (R. at 14-16.)  Even more, the ALJ found the credibility of Plaintiff's statements regarding the severity of his pain belied by the sporadic nature of his efforts to obtain treatment (because he sought treatment only from his family

doctor), and by his participation "in rigorous physical activity since his alleged disability onset date including carrying a mattress down the stairs, helping his sister move, shoveling snow, and doing 'wheelies' on his bicycle." (R. at 16.)

Turning then to the treatment records and opinion evidence from Dr. Pirolli, the ALJ acknowledged the ordinarily "controlling weight" of "treating source opinions," when otherwise consistent with the "substantial evidence of record." (R. at 16-17.) The ALJ's RFC assessment, in turn, reflects that he took great pains to incorporate the notations contained within Dr. Pirolli's long history of treatment notes (see, e.g., R. at 15-16 (crediting the various notations of Dr. Pirolli)), and indeed assigned "great weight" to Dr. Pirolli's opinions that Plaintiff could "lift and carry 10 pounds occasionally" and less than 10 pounds "frequently," and "could stand and walk for 2 hours, and sit for up to 6 hours." (R. at 17.) The ALJ, however, assigned "less weight" to Dr. Pirolli's opinion that Plaintiff's impairments left him "unable to work on a full time or part time basis," because he found that conclusion inconsistent with Dr. Pirolli's own treatment records, the findings of the consultative examiners and state agency physicians, and Plaintiff's admission that he continued to work after his alleged disability onset date. (R. at 17-18.)

Plaintiff takes issue with the ALJ's interpretation of Dr. Pirolli's opinion, based upon his view that the ALJ should have, in essence, afforded the opinion dispositive weight. (See Pl.'s Br. at 12-14.) Nevertheless, even a cursory inspection of Dr. Pirolli's treatment notes reflect their incongruity with the reports he submitted for purposes of Plaintiff's benefits' applications. (Compare R. at 435-46, 507-10, with R. at 468-69, 505-06, 511-12.) Indeed, the treatment records reveal mostly benign findings, including negative sitting root test results, good heel and toe walking, no radiculopathy, and a marked decreased in pain with medication. (See R. at 435-46, 507-10.) Dr. Pirolli's no-work opinion, by contrast, states that Plaintiff's impairment precludes him from work, but provides, on its face, no medical evidence or findings to buttress this view, much less any direct linkage to Dr. Pirolli's own treatment records. (See R. at 468-69, 505-06, 511-12.) Indeed, although the various forms prompted Dr. Pirolli to provide the specific medical findings underpinning his conclusions, he provided essentially no detail concerning the basis for his disability/no-work finding.[11] (See, e.g., id.) Aside from these

---

[11] In fact, in one of his work-related activities opinions, Dr. Pirolli left unanswered the fields related to the frequency and length of his contact with Plaintiff, the precise diagnoses and symptoms, and Plaintiff's overall prognosis. (See R. at 468-69.) Then, in a follow-up work-related activities opinion, he based his "medical findings" solely upon the scoliosis

circumstances, Dr. Pirolli's last no-work opinion proves somewhat internally inconsistent (particularly given the absence of medical findings), because he described Plaintiff as ambulatory, and able to stand, walk, climb, stoop, bend, lift, and use his hands (albeit for shorter time frames), but still concluded, without explanation, that Plaintiff could not maintain employment.  (See R. at 511.)

In view of these deficiencies, these opinions provide "weak evidence at best" on the issue of Plaintiff's residual functional capacity, Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (describing "form," "check a box," or "fill in a blank" forms as "weak evidence at best"); see also Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986) (finding the reliability of RFC reports that lack "thorough written reports ... suspect"), and the ALJ acted within his authority in deciding to assign Dr. Pirolli's work-related opinions lesser weight, on account of their inconsistency with his treatment records (among other factors, discussed below).  See Plummer, 186 F.3d at 429 (explaining that an ALJ may reject the opinion of a treating physician on the basis of inconsistencies and/or contradictory medical evidence); Coleman v. Comm'r of Soc. Sec.,

---

"hardware" installed in Plaintiff's back in 1995, but not any portion of his years of personal treatment and observation of Plaintiff.  (R. at 505-06.)

494 F. App'x 252, 254 (3d Cir. 2010) (explaining that "if the opinion of a "treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason"); Brown, 649 F.3d at 197 n.2 (the "law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity").

Aside from this inconsistency, Dr. Pirolli's work opinions conflicted with the functional capacity findings of essentially every other medical source, and with Plaintiff's own representations concerning his physical abilities.  Indeed, the consultative and state agency examiners both identified Plaintiff's ability to perform a range of activities, and the various emergency room physicians similarly found that Plaintiff retained a full range of motor skills, a normal range of motion, and only mild to moderate tenderness in his lower back.  (See, e.g., R. at 66-69 (reproducing Dr. Kahanowicz view that Plaintiff could perform the full range of "light" sedentary work), R. at 82-101 (same), R. at 372-77 (reproducing emergency room records reflecting Plaintiff's marked improvement upon treatment), R. at 463-67 (reproducing Dr. Bagner's opinion concerning, among other things, Plaintiff's ability to ambulate without assistance).)  In addition to the results of these examinations, Plaintiff showed himself able to perform a panoply

27

of physical activities (from shoveling snow <u>for a week</u> to biking and helping to fix a car), and continued to work even after he claimed his back pain intensified in 2008 and 2009.  (<u>See, e.g.</u>, R. at 33-35, 192-95, 251-58, 378, 388, 493.)

Against that backdrop, the Court perceives no error in the ALJ's treatment of Dr. Pirolli's work opinions, and finds that his RFC determination rests upon substantial record evidence. <u>See</u> <u>Burke v. Comm'r of Soc. Sec.</u>, 317 F. App'x 240, 243 (3d Cir. 2009) (finding no error in the ALJ's decision to give little weight to the opinion of a treating physician, where the opinion proved "inconsistent with the other medical evidence of record and with his own progress notes"); <u>Cruz</u>, 2016 WL 1091347, at *9 (finding no error in the ALJ's decision to assign lesser weight to the work-related opinions of the plaintiff's treating psychiatrist, given its inconsistency with other record evidence).  The Court therefore turns to Plaintiff's second challenge.

## B. Whether the ALJ Improperly Relied Upon the Vocational Grids

In order to determine at step 5 whether jobs exists in the national economy for a particular plaintiff, the Court of Appeals generally requires that an ALJ support its determination by citing to relevant rules, relying upon vocational testimony, and/or by taking judicial notice of certain vocational

resources.  See Sykes v. Apfel, 228 F.3d 259, 273 (3d Cir. 2000); Hall v. Comm'r of Soc. Sec., 218 F. App'x. 212, 217 (3d Cir. 2007).

When a claimant exhibits "only exertional (i.e. strength) impairments," the ALJ may properly rely in step five solely upon the Medical-Vocational framework, or grids.  Nieves v. Comm'r of Soc. Sec., No. 12-5590, 2013 WL 3811645, at *4 (D.N.J. July 22, 2013) (citing Sykes, 228 F.3d at 269); see also Torres v. Comm'r of Soc. Sec., No. 14-6178, 2015 WL 8328346, at *6 (D.N.J. Dec. 8, 2015) (same).  Where, however, the claimant exhibits a blend of exertional and nonexertional limitations, as Plaintiff claims here, the ALJ cannot simply rely on the medical-vocational guidelines to direct a finding of not disabled at step five. See Hall, 218 F. App'x at 215.  Rather, the ALJ must ordinarily resort to vocational testimony or a similar vocational resource (like, for example, a learned treatise).  See Sykes, 228 F.3d at 273.

Based upon Plaintiff's "residual capacity for the full range of sedentary work," the ALJ in this instance looked to Medical-Vocational Rule 201.27, and determined that it directed a finding of "'not disabled.'"  (R. at 19.)  Plaintiff takes issue with this sole reliance, based upon Dr. Pirolli's findings that Plaintiff (1) could rarely climb bend, crouch, lift heavy weights (above 25 pounds), (2) could rarely reach in all

29

directions (including overhead), (3) would frequently have to alternate between sitting and standing in order to relieve pain, and (4) would have to avoid exposure to humidity/wetness and hazards.  (See Pl.'s Br. at 14-17; Pl.'s Reply at 2-5; R. at 468-69.)  In other words, Plaintiff advances the view that the ALJ failed to account for the record evidence of Plaintiff's postural, environmental, reaching-based, and sit-standing limitations (i.e., his nonexertional limitations).  (See Pl.'s Reply at 3-4.)

On this issue, the Court notes, at the outset, that Plaintiff points to nonexertional limitations without substantial footing in the medical record evidence, as recounted above in Sections II.A and II.B.  Nevertheless, even if the ALJ should have incorporated these limitations within his step 5 determination, Plaintiff concedes that various Social Security Rulings (hereinafter, "SSRs") make plain that nonexertional limitations of the sort claimed here would not ordinarily impact an individual's ability to perform unskilled sedentary work. Indeed, SSR 96-9P squarely states that vocational resources (aside from the grid) would rarely be required in the face of postural or environmental restrictions, because sedentary work would not ordinarily involve significant abilities in these areas.  See 1996 WL 374185, at *7-*9.

The SSRs similarly permit latitude to ALJs in determining whether to seek vocational assistance based upon limitations to an individual's ability to reach and/or handle, see SSR 85-15, 1985 WL 56857, at *7 (explaining that "the assistance of a [vocational expert] may be needed to determine the effects" of significant "limitations of reaching or handling"), and an individual's need to oscillate between a seated and standing position. See SSR 96-9P, 1996 WL 374185, at *7. Even more critically, though, SSR 96-9P defines "sedentary work" to include sitting, as well as occasional walking and standing. SSR 96-9P, 1996 WL 374185, at *3. Indeed, work remains "sedentary" within the meaning of the SS regulations, even if walking and/or standing subsumes "up to one-third" of a given workday. Id. This level of alternation, in turn, proves entirely consistent with sit-stand limitations identified by Dr. Pirolli. (See, e.g., R. at 468.)

Aside from these circumstances, the nonexertional limitations claimed by Plaintiff conflict with the physical pursuits and work he performed and identified subsequent to his alleged disability onset date (see, e.g., R. at 45-47, 243-258, 493 (describing Plaintiff's biking on or about April 15, 2014)), as well as the various medical observations of Plaintiff's abilities. (See, e.g., R. at 33-35, 66-69, 82-101, 192-95, 251-58, 378, 388, 463-467, 493.)

31

Against that backdrop, the Court finds no error in the ALJ's reliance upon Medical-Vocational Rule 201.27.[12]

**V. CONCLUSION**

For all of these reasons, the Court finds that substantial evidence supports the ALJ's decision to deny Plaintiff benefits, and that it should be affirmed.  An accompanying Order will be entered.


**April 26, 2016**                          **s/ Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                      Chief U.S. District Judge

---

[12] Although Plaintiff concedes that the SSRs direct themselves at the effect of certain nonexertional limitations on the ability to perform sedentary work, Plaintiff maintains that the ALJ erred by not evaluating the cumulative impact of these nonexertional limitations.  (See Pl.'s Reply at 4.)  Despite this position, Plaintiff has not explained how the ALJ's failure to include these nonexertional limitations, standing alone or together, resulted in harmful error, see Shinseki v. Sanders, 129 S. Ct. 1696, 1706 (2009) (requiring that the party seeking remand explain how any error proved harmful), and his citation to the requirement that the ALJ consider the combined impact of impairments (as opposed to functional limitations) proves inapposite here.  (See Pl.'s Reply at 4 (citations omitted).)